#25767-a-SLZ

**2011 S.D. 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CARLIN JEWETT, SR.,                                  Claimant and Appellant,

    v.

REAL TUFF, INC.,                                     Employer and Appellee,

    and

ACUITY, a Mutual Insurance
Company,                                             Insurer and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MARK BARNETT
Judge

\* \* \* \*

WESLEY W. BUCKMASTER of
Buckmaster Law Offices, PC                    Attorneys for claimant
Belle Fourche, South Dakota                   and appellant.

MICHAEL S. MCKNIGHT
CHARLES A. LARSON of
Boyce, Greenfield, Pashby
  & Welk LLP
Sioux Falls, South Dakota                     Attorneys for appellees.

\* \* \* \*

CONSIDERED ON BRIEFS
ON APRIL 25, 2011

OPINION FILED **06/29/11**

#25767

ZINTER, Justice

[¶1.]         Carlin Jewett, Sr. sought workers' compensation benefits for a right knee replacement and for diagnostic treatment of his left knee. Jewett relied on two theories. He first contended that work-related injuries to both knees were a major contributing cause of the need for the medical treatment. Under his second (alternative) theory, Jewett acknowledged that he had pre-existing bilateral patellofemoral osteoarthritis that caused the need for the medical treatment. However, he contended that the cumulative effect of his work-related activities for Real Tuff, Inc. was a major contributing cause of the osteoarthritis. The South Dakota Department of Labor (Department) and circuit court ruled that Jewett failed to sustain his burden of proof on both theories. We affirm.

*Facts and Procedural History*

[¶2.]         Jewett is a forty-nine-year-old welder. He worked for Real Tuff from 1996 to 2009, with the exception of a six month period in 2002. Jewett's work involved the manufacture of livestock bale feeders, feed bunks, corral panels, gates, trailers, and other products used by cattlemen. Jewett's work often required him to kneel on a concrete floor to weld components of the bale feeders, to bend metal skirts, and to weld other products.

[¶3.]         According to Jewett's estimate provided at the Department hearing, he spent 475 days between 1997 and 2002, and 245 days between 2003 and 2008, crawling on the floor performing his work. Real Tuff's estimates were significantly less. There is, however, no dispute that before 2003, Jewett performed duties from a kneeling position on bare knees. After a 2003 Occupational Safety and Health

-1-

Administration inspection, Real Tuff provided knee pads and rubber floor mats. Real Tuff also allowed employees to build jigs and tables to hold the products off the floor during assembly. This change allowed Jewett to spend less time kneeling and more time in a seated position on a small rolling stool.

[¶4.] Jewett had not sought medical treatment for his right knee before August 2006. On August 1, 2006, he picked up a corral panel to turn it over and in the process his right knee "snapped back" and "popped." Jewett immediately felt a sharp pain and reported the injury to Real Tuff. Jewett was referred to Mobridge Orthopedic Surgery Specialists. Dr. James Mantone, a board-certified orthopedic surgeon, became Jewett's treating physician.

[¶5.] Dr. Mantone ordered an MRI that revealed a "loose body" in Jewett's right knee (patellofemoral joint).[1] Dr. Mantone subsequently performed arthroscopic surgery, which removed the loose body and cartilage debris that had been dislodged from Jewett's medial femoral condyle in the accident. Dr. Mantone also performed chondroplasties on the rough areas to smooth the medial femoral condyle and patellofemoral joint.

[¶6.] While performing the surgery, Dr. Mantone found significant osteoarthritis in Jewett's medial femoral condyle and patellofemoral joint. The arthritis was pre-existing, advanced patellofemoral degenerative disease with diffused grade four changes in the central and medial facet and medial portion of the trochlea. Grade four changes are the most serious type of arthritis, meaning

---

1. Dr. Mantone referred to this condition as osteochondritis dessicans.

that there was exposed bone in Jewett's knee. Dr. Mantone also observed grade two to three changes in the medial femoral condyle.

[¶7.]     After the surgery, Jewett continued to experience fluid buildup, pain, "give-way" weakness, catching, locking, and the inability to straighten his knee. Dr. Mantone ultimately recommended that Jewett obtain a partial or total right knee replacement.

[¶8.]     Real Tuff's insurer (Insurer) paid for the medical care, including the arthroscopic surgery. But after an independent medical examination, Insurer denied compensation for additional medical treatment and benefits. Insurer's physician believed that Jewett's remaining condition and need for treatment after the surgery were caused by pre-existing, non-work related osteoarthritis. Jewett subsequently filed a petition with the Department seeking workers' compensation for a right knee replacement.

[¶9.]     In July 2008, Jewett suffered a second work-related injury at Real Tuff—this time to his left knee. Dr. Mantone recommended an MRI as reasonable and necessary to diagnose the condition of Jewett's left knee. Based on Jewett's pre-existing osteoarthritis, Insurer declined to pay for the MRI. Jewett then added a workers' compensation claim for the MRI.

[¶10.]     At the hearing, Dr. Mantone testified (by deposition) that the August 2006 work-related injury was a major contributing factor in Jewett's need for a right knee replacement. Dr. Mantone's opinion was based on the continuity of symptoms. He explained that Jewett's work-related injury produced symptoms that initially required care and those symptoms continued. However, Dr. Mantone

conceded that Jewett's pre-existing arthritis also played a role in the need for a knee replacement. He testified that he could not replace any of the articular cartilage in Jewett's knee because Jewett had too much arthritis. Further, when asked what part of the knee would need to be replaced, Dr. Mantone responded, "I think in him for where his *disease* is maximal is the patellofemoral joint." (Emphasis added.) Dr. Mantone conceded that Jewett may have required a right knee replacement based on his pre-existing arthritis.

[¶11.]    With respect to Jewett's alternative theory, Dr. Mantone believed that Jewett's arthritic changes could have been the result of repetitive use-abuse type work activities. Dr. Mantone opined that Jewett's work on his knees on a concrete floor over the course of five or six years was a major contributing cause of the arthritic changes in Jewett's knees. Dr. Mantone's opinion was based on Jewett's deposition description of the time he spent working on his knees. Dr. Mantone also observed that Jewett was a younger man and a doctor would not expect Jewett's level of arthritis without a cause or injury significant enough to produce the observed level of arthritis. Dr. Mantone finally noted that Jewett had arthritis in his knees, but in no other joint in his body. He ultimately opined that Jewett's work was aggravatory and "accelerating [the] wear within [both] knees."

[¶12.]    Dr. Mantone, however, agreed that his opinion regarding the cause of the arthritis was dependent upon the amount of kneeling Jewett actually performed. He also conceded that other factors could contribute to the development of arthritis in the knee, including genetics. He admitted that he had treated people

whose jobs required significant time kneeling or squatting and some patients developed osteoarthritis while others did not.

[¶13.]     Dr. Raymond Emerson, an orthopedic surgeon, was hired by Insurer to conduct an independent medical examination. Dr. Emerson performed a physical examination; viewed Jewett's intraoperative arthroscopy pictures, MRI, and x-rays; and reviewed Jewett's medical records. Dr. Emerson also reviewed the depositions of Dr. Mantone, Dr. John Dowdle, Jr. (another independent medical examiner), and Jewett. Dr. Emerson testified (by deposition) that Jewett's August 2006 injury was not a major contributing cause of the need for a right knee replacement. Dr. Emerson reasoned that the August 2006 injury dislodged the loose body, which had not been causing mechanical symptoms before the work injury. He indicated that Dr. Mantone's arthroscopic surgery successfully removed the loose body. He believed Jewett's symptoms remaining after the surgery were caused by his pre-existing osteoarthritis rather than the August 2006 injury.

[¶14.]     Dr. Emerson also testified that Jewett's cumulative work-related activities as a welder were not a major contributing cause of his arthritis. Dr. Emerson testified that it is hard to determine whether any activity will predictably cause osteoarthritis.[2] He indicated that even based on an estimate that Jewett

---

2.     Dr. Emerson testified:

> A.     In most cases we don't know what causes osteoarthritis of a knee. It can be genetically linked. There is some genetic predisposition that some people have to their knee wearing out in the process of osteoarthritis. It can be related to significant injuries to a knee, and from the history, I didn't find any significant injury to his knee.
>
> (continued . . .)

worked on his knees on concrete for an average of ten to fifteen hours per week for five years, it was unknown whether such work could materially contribute to the development of osteoarthritis.

[¶15.]     Dr. Richard Farnham, a board certified independent medical examiner, also performed an examination. He agreed that the August 2006 work injury dislodged a piece of cartilage in Jewett's right knee. Like Dr. Emerson, Dr. Farnham opined that the arthroscopic surgery removed the loose body, and the work injury caused no other medical problem or degenerative changes.[3]

[¶16.]     Dr. Dowdle, an orthopedic surgeon, performed the final independent medical examination. Dr. Dowdle reviewed Jewett's medical records and performed a physical examination. Dr. Dowdle testified (by deposition) that Jewett's work-related injury caused an effusion (release of fluid) in the right knee. Dr. Dowdle agreed that Jewett's post-arthroscopy symptoms were consistent with an arthritic knee. He opined that the August 2006 work injury was not a major contributing

_____

(. . . continued)

Q.     Have you had occasion in your practice to see and treat individuals who have osteoarthritis in a knee, or in their knees?

A.     Yes.

Q.     And [have] you seen any correlation between osteoarthritis in the knees and the type of activity that a person does?

A.     Seems to vary so much, it's hard to determine any activity that will predictably cause osteoarthritis.

3.     Jewett points out that Dr. Farnham indicated Jewett was still suffering inflammation from the arthroscopic surgery. Although this observation is relevant to the question of maximum medical improvement, it sheds little light on the causal relationship between Jewett's arthritis and the need for a right knee replacement.

cause for any treatment after the arthroscopy. He believed that a knee replacement was needed because of the arthritis in Jewett's knee, "to replace the knee because the surfaces are bad."

[¶17.] With respect to osteoarthritis and cumulative trauma, Dr. Dowdle testified that osteoarthritis is generally independent of work activities. With respect to Jewett, Dr. Dowdle opined that Jewett's arthritis was "independent of his kneeling events on his knees." Dr. Dowdle explained that many office professionals have the same type of patellofemoral arthritis but do not work on their knees. Dr. Dowdle believed that the type of work performed does not necessarily indicate whether one will or will not develop patellofemoral osteoarthritis.

[¶18.] After considering all of the evidence, the Department found that Jewett suffered an August 2006 work-related injury to his right knee, which was a major contributing cause of the need for the medical treatment he received. The Department found that the injury caused the loose body within Jewett's right knee to become dislodged, which caused the symptoms and the need for the arthroscopic surgery. However, with respect to the need for a right knee replacement, the Department rejected the opinion of Dr. Mantone in favor of Dr. Emerson. The Department concluded that Jewett's August work 2006 injury was not a major contributing cause of the need for a right knee replacement.

[¶19.] With respect to Jewett's left knee, the Department concluded that the July 2008 work-related injury was a major contributing cause of Jewett's need for

diagnostic treatment. Consequently, the Department ordered Insurer to pay for an MRI of Jewett's left knee. Real Tuff and Insurer did not appeal that ruling.[4]

[¶20.] The Department finally concluded that Jewett's work for Real Tuff was not a major contributing cause of his bilateral patellofemoral osteoarthritis. The Department found that the majority of Jewett's work was spent in a physical stance other than kneeling. The Department did not make an explicit finding regarding the amount of time Jewett actually spent on his knees. The Department did, however, find that Jewett's estimates from 1997 to 2002 would have put him kneeling on the floor about one-third of his working time. Nevertheless, the Department found that the most persuasive medical opinion was that osteoarthritis has a number of causes and that Jewett's osteoarthritis was likely caused by something other than his work. The Department rejected Dr. Mantone's opinion because his opinion was based on an inaccurate history of the amount of time Jewett actually spent kneeling.

[¶21.] We consider the following issues on appeal:

1. Whether Jewett's August 2006 work-related injury was a major contributing cause of his need for a right knee replacement; and alternatively,

2. Whether Jewett's work-related activities were a major contributing cause of his bilateral patellofemoral

---

4. In February 2010, an MRI was performed on Jewett's left knee. The Department has not considered any claim for medical or disability benefits following the MRI. Therefore, we do not consider any claim that the July 2008 work-related injury was a major contributing cause of the need for further treatment of the left knee. Because the record has been finalized with respect to Jewett's theory that cumulative work activities were a major contributing cause of his bilateral osteoarthritis, we have considered but reject that claim.

osteoarthritis, which caused the need for a right knee replacement and possible future left knee treatment.

*Decision*

**Right Knee: August 2006 Work-Related Injury**

[¶22.]    There is no dispute that Jewett had serious, pre-existing osteoarthritis in both knees.  Nevertheless, there is no dispute that Jewett's August 2006 work injury was a major contributing cause of his need for the arthroscopic surgery relating to his right knee.  The question is whether that work-related injury remained a major contributing cause of Jewett's subsequent need for a right knee replacement after the surgery.  We review the Department's findings of fact for clear error, and we review its conclusions of law de novo.  *Orth v. Stoebner & Permann Constr., Inc.*, 2006 S.D. 99, ¶ 27, 724 N.W.2d 586, 592.

[¶23.]    When a work injury combines with a pre-existing condition to cause or prolong the disability, impairment, or need for treatment, the claimant must prove that "the employment or employment related injury is and *remains* a major contributing cause of the disability, impairment, or need for treatment."  SDCL 62-1-1(7)(b) (emphasis added).[5]  The required proof of causation "must be established

_____

5.    Jewett relies on *Orth*, 2006 S.D. 99, ¶ 48, 724 N.W.2d at 597, for the proposition that an employer must "take the employee as [it] find[s] him," and that "[i]f a compensable event contribute[s] to the final disability, recovery may not be denied because of the pre-existing condition, even though such condition was the immediate cause of the disability."  This language in *Orth* was taken from *Elmstrand v. G & G Rug & Furniture Co.,* 77 S.D. 152, 155, 87 N.W.2d 606, 608 (1958).  But *Elmstrand* was decided before the enactment of SDCL 62-1-1(7)(a) and (b).  At the time of *Elmstrand*, causation issues were governed by "SDC Supp. 64.0102(4)[,] which declare[d] that injury or personal injury shall mean 'only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form except as it shall result from the injury[.]'" *Elmstrand*, 77 S.D. at 154,

(continued . . .)

to a reasonable degree of medical probability, not just possibility." *Darling v. W. River Masonry, Inc.*, 2010 S.D. 4, ¶ 12, 777 N.W.2d 363, 367. "The evidence must not be speculative, but must be 'precise and well supported.'" *Id.* (citation omitted). Because the expert medical testimony in this case was presented through depositions, we consider it anew. *See id.* ¶ 14.

[¶24.] Jewett's theory to satisfy the causation requirement of SDCL 62-1-1(7)(b) is based on the temporal sequencing of symptoms; namely, that the August 2006 injury made Jewett's previously asymptomatic knee symptomatic. Concededly, the causation of symptoms is an important factor in finding a causal relationship. But in this case Jewett seeks a knee replacement after the surgery that was intended to remove the dislodged loose body that appeared to have caused the initial symptoms. And, in the course of that surgery, significant pre-existing osteoarthritis was discovered. Nevertheless, Dr. Mantone held to his causation opinion based only on a temporal sequencing of symptoms. He opined that a major

---

(. . . continued)

> 87 N.W.2d at 607. That causation language ("arising out of and in the course of employment") is now found in the first paragraph of SDCL 62-1-1(7) and does "not increase the causal connection a worker must show between his *injury* and his employment." *Grauel v. S.D. Sch. of Mines & Tech.*, 2000 S.D. 145, ¶ 9, 619 N.W.2d 260, 263. But the language of SDCL 62-1-1(7)(a) and (b) now "place[s] a new burden on the worker to show that his employment activities were a major contributing cause of his resulting *condition*" or disability, impairment, or need for treatment. *Id.* Therefore, the "take the employee as we find him" and the "event contributed" language of *Elmstrand* apply only to the causal connection that must be demonstrated between the *injury* and employment. That is not the issue in this case. This case involves the new burden of demonstrating that work-related activities are and remain a major contributing cause of the *resulting* condition, disability, impairment, or need for medical treatment. *Elmstrand* has been modified to this extent, and therefore, Jewett's reliance on *Orth* is misplaced.

contributing causal link existed simply because Jewett's original injury at work caused symptoms that plagued him even after arthroscopic surgery.[6] But SDCL 62-1-1(7)(b) requires proof that the work-related injury *remains* a major contributing cause of an injured worker's disability, impairment, or need for treatment. And Dr. Mantone did not know whether Jewett's post-surgery symptoms would have remained after the loose body was successfully removed had Jewett not suffered from pre-existing arthritis.[7]

---

6.      Dr. Mantone testified:

> A.      *He had an injury that has produced symptoms that has required care for. That injury is a work injury. He's still having the symptoms from him* [*sic*]. *The cause, whether his arthritis is pre-existing or not is immaterial.* The injury didn't have to cause the arthritis. It has to cause the symptoms of what he requires treatment for, and that's exactly what's happened here. . . .
>
> Q.      And this is your opinion insofar as the idea that the work-related injury or incident is a major contributing factor to [Jewett's] existing condition and to the existing impairment and need for treatment?
>
> A.      Correct.

(Emphasis added.)

7.      Dr. Mantone testified:

> Q.      And if he had not had the pre-existing patellofemoral arthritic changes, would he still have symptoms from the direct original injury location?
>
> A.      Yeah, because it would still be on the inside of his, the inside end of his femur, the medial femoral condyle, he would still have injury as well from this. *So I don't think there is a way of saying would he still be with it or without it. I don't know.* He's had two bad injuries. One is a bad injury to his medial femoral condyle. So he need be here from either one of those as a reasonable probability.

(Emphasis added.)

[¶25.] These deficiencies in Dr. Mantone's opinion were significant in light of Dr. Emerson's explanation that Jewett's symptoms were signs and symptoms of the pre-existing arthritis. Dr. Emerson did not attribute Jewett's postsurgical symptoms to any other cause. Moreover, Dr. Mantone's testimony indirectly supported Dr. Emerson. When asked what part of Jewett's knee would need to be replaced, Dr. Mantone confirmed that it was the patellofemoral joint—"where his *disease* is maximal." (Emphasis added.) *See* SDCL 62-1-1(7) (providing that an "'[i]njury' or 'personal injury,' [is] only [an] injury arising out of and in the course of the employment, and does not include a disease in any form except as it results from the injury").

[¶26.] This case is similar to *Grauel*, 2000 S.D. 145, 619 N.W.2d 260. *Grauel* involved a work injury to a knee with pre-existing, degenerative arthritis. *Id.* ¶¶ 2, 4, 21. Grauel's injury caused a "pop" in his knee and immediate pain. *Id.* ¶ 2. The treating physician performed arthroscopic surgery, removing the resulting "loose bodies" from the knee. *Id.* ¶ 4. We adopted the medical opinion that following the removal of the loose bodies, claimant's pre-existing arthritis rather than employment activities was a major contributing cause of the claimant's knee condition. *Id.* ¶¶ 4, 21.

[¶27.] As in *Grauel*, the Department did not err in adopting the similar and more persuasive opinion of the independent medical examiner. Dr. Emerson's opinion was based on the view that the loose body and debris dislodged by the work injury were removed during surgery. Thereafter, Jewett's remaining symptoms were caused by his pre-existing osteoarthritis. Considering all of the evidence, the

opinion of Dr. Emerson was more persuasive. The Department did not err in finding that Jewett's August 2006 injury was not a major contributing cause of Jewett's need for a right knee replacement.

**Both Knees: Cumulative Trauma**

[¶28.] Jewett alternatively concedes that his bilateral patellofemoral osteoarthritis was a major contributing cause of his need for a right knee replacement and possible future treatment for his left knee. However, he argues that his work-related activities for Real Tuff were a major contributing cause of the arthritis.[8] Under this theory, Jewett must satisfy the causal requirements of SDCL 62-1-1(7)(a), which provides: "No injury is compensable unless the employment or employment related activities are a major contributing cause of the condition complained of[.]"

[¶29.] The question then is whether the Department erred in rejecting Dr. Mantone's opinion that Jewett's work on his knees was a major contributing cause of his bilateral osteoarthritis. Jewett argues that the Department did not give Dr. Mantone's opinion "appropriate weight." The Department, however, did not reject Dr. Mantone's opinion on this question because his opinion lacked sufficient weight. The Department rejected Dr. Mantone's opinion because it was based on an erroneous factual foundation. Dr. Mantone's opinion was conditioned on the time Jewett indicated he worked in a kneeling position. Dr. Mantone obtained that

---

8. Dr. Mantone, Dr. Emerson, and Dr. Dowdle all agree that the single August 2006 injury did not cause Jewett's osteoarthritis. The Department found: "[Jewett's] bilateral patellofemoral osteoarthritis is advanced to such a degree that any recent traumatic event would not be the cause of the bilateral patellofemoral osteoarthritis."

information from Jewett's deposition description of the time he spent kneeling. In his deposition, Jewett testified that he spent "six months out of the year" kneeling from 1996 to 2002. But, the evidence presented by Jewett at the hearing put Jewett kneeling on the floor only about one-third of his working time from 1997 to 2002. When it became evident at the hearing that Dr. Mantone had based his opinion on Jewett's deposition description of kneeling six months a year, Jewett attempted to retract that testimony. Jewett indicated that his prior testimony should not be read "literally" and was inaccurate. The Department correctly noted that an expert's opinion is entitled to no more weight than the facts it stands upon. *Darling*, 2010 S.D. 4, ¶ 13, 777 N.W.2d at 367.

[¶30.]    We also observe that Dr. Mantone's opinion was undermined by both his own testimony and that of Dr. Emerson and Dr. Dowdle. Dr. Mantone admitted that some patients who spend significant time kneeling or squatting develop osteoarthritis while others do not. He also conceded that there are other factors that contribute to the development of osteoarthritis. Dr. Emerson explained that it is hard to determine whether any activity will predictably cause osteoarthritis. He opined that the cause of Jewett's arthritis was unknown even under the factual assumption that Jewett worked on his knees for at least ten to fifteen hours a week over a period of up to five years.

[¶31.]    Dr. Dowdle also opined that the development of osteoarthritis is generally independent of work activities, including kneeling. He disclosed: "There is no literature that indicates that there is activity or occupation related development of osteoarthritis." Dr. Dowdle testified that "the circumstances [are]

such that no matter whether somebody is sitting in a chair and not moving at all, not walking at all, their osteoarthritis continues to progress." Dr. Dowdle opined that Jewett's work events could cause him soreness in his knees, but could not cause his chondromalacia or arthritic changes.

[¶32.] Jewett, however, likens his case to *Arends v. Dacotah Cement*, 2002 S.D. 57, 645 N.W.2d 583. In *Arends*, we found that a claimant's osteoarthritis was a compensable work-related injury based on cumulative trauma suffered by claimant during his employment activities. *Id.* ¶ 16. But in *Arends* the "[f]indings taken from [an] MRI, arthroscopic surgery, and the examinations of *both* doctors demonstrate[d] to a reasonable medical probability that Arends'[s] chronic condition . . . was caused by the cumulative trauma from years of bending, stooping and kneeling on concrete." *Id.* (emphasis added). Jewett did not make such a showing. Jewett's only supporting medical opinion was based on an inaccurate factual foundation. Furthermore, Dr. Emerson and Dr. Dowdle more persuasively opined that Jewett's work-related activities were not a major contributing cause of his osteoarthritis. We agree with the Department and the circuit court that Jewett did not prove by a reasonable degree of medical probability that working on his knees was a major contributing cause of his bilateral patellofemoral osteoarthritis.

[¶33.] Affirmed.

[¶34.] GILBERTSON, Chief Justice, and KONENKAMP, and SEVERSON, Justices, and MEIERHENRY, Retired Justice, concur.